**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TIMOTHY J. WALDRON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 20-0136 |
| | ) | |
| JOHN WETZEL, Secretary of the PA Department | ) | Magistrate Judge Dodge |
| of Corrections, in his official and individual | ) | |
| capacity, and MELINDA ADAMS, Superintendent | ) | |
| of SCI Mercer, in her individual and official | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Timothy J. Waldron brings this civil rights action pursuant to 42 U.S.C. § 1983, raising constitutional claims arising out of his confinement for 185 days under restricted conditions at the State Correctional Institution at Mercer, Pennsylvania ("SCI Mercer"). Named as Defendants are John Wetzel, the Secretary of Pennsylvania Department of Corrections ("DOC") and SCI Mercer Superintendent Melinda Adams.

Currently pending before the Court are cross-motions for summary judgment (ECF Nos. 29, 32). For the reasons that follow, Defendants' motion will be granted in part and denied in part and Plaintiff's motion for partial summary judgment will be denied.

### I.    Relevant Procedural History

Plaintiff commenced this action by filing a Complaint in January 2020 (ECF No. 1). The Complaint alleged in Count I that Plaintiff's indefinite confinement in restricted housing constituted cruel and unusual punishment in violation of the Eighth Amendment. In Count II, Plaintiff claimed that his confinement without an explanation, a hearing or an opportunity for review, as well as Defendants' failure to transport him to preliminary hearings, violated his due

process rights under the Fourth, Fifth and Fourteenth Amendments. In addition to monetary damages, he sought a declaratory judgment, attorneys' fees and other relief.

Defendants' subsequent motion to dismiss (ECF No. 10) was granted in part and denied in part (ECF Nos. 14, 15). As a result, the remaining claims in the case are Plaintiff's Fourteenth Amendment procedural and substantive due process claims in Court II.

After the close of discovery, both parties moved for summary judgment (ECF Nos. 29, 32).  Plaintiff seeks partial summary judgment in his favor as to his procedural due process claim only.  Both motions have been fully briefed (ECF Nos. 30, 33, 36, 38) and are ripe for disposition.

## II.    Factual Background

### A.  Facts Relating to Restrictive Custody

Plaintiff was charged in 2002 with Driving Under the Influence ("DUI") Manslaughter in Florida and served a five-year prison sentence, followed by a ten-year term of probation. As a result of a traffic stop on November 7, 2018 in Pennsylvania, Plaintiff was charged with DUI in violation of his probation. Plaintiff was taken to SCI Mercer on December 10, 2018. (Defendants' Statement of Material Facts ("DSMF") ¶¶ 1-3) (ECF No. 30.)[1]

Plaintiff was confined in a restricted section of SCI Mercer between December 10, 2018 and June 19, 2019, other than on several occasions when he was transported to the Allegheny County Jail. Plaintiff refers to his confinement as being in the Restricted Housing Unit ("RHU"). (Plaintiff's Concise Statement of Material Facts ("PCSMF") ¶¶ 1-2) (ECF No. 33.) Defendants assert that he was actually confined in the Limited Privilege Housing Unit ("LPHU") at SCI

---

[1] Plaintiff has not submitted a response to Defendants' Statement, although he has submitted his own Concise Statement in support of his partial motion for summary judgment and he has responded to Defendants' facts in his briefs.

Mercer on Administrative Custody ("AC") status. Plaintiff was incarcerated in restricted custody at SCI Mercer for approximately 185 days. (DSMF ¶¶ 4-5.) While he was briefly housed with another inmate on two occasions for several days, Plaintiff was in solitary confinement during most of his incarceration. (*Id.* ¶ 6.)

According to Defendants, inmates were not housed in the LPHU for disciplinary reasons. Rather, they were housed there because DOC did not have the necessary classification information to safely house them elsewhere.[2] Out-of-state probation violators were placed in RHU Administrative Custody I, the LPHU subcategory. Defendants contend that inmates housed in the LPHU do not have quite as many privileges as inmates in the general population but have significantly more privileges than inmates in other housing designations within the RHU. According to Defendants, RHU inmates have just one hour a day for out of cell recreation, while LPHU inmates can eat their meals out of their cells, have a yard area, and can have televisions in their cells. (DSMF ¶¶ 9-10.)

Plaintiff testified that because he was not permitted to purchase a cable connection, however, he did not have a television that could work. (Waldron Dep. (ECF No. 34 Ex. 1) 23:6-8.) Plaintiff also testified that the LPHU was "not really a unit per se. It's just a bunch of cells down there in confinement . . . It was no different from the rest of confinement. It's all confinement." (*Id.* at 16:10-14.) Mark Bowman, who was incarcerated in the LPHU during the same time period, testified that there was no difference between the conditions in the RHU and the LPHU and that LPHU inmates could not go outside.[3] See Civ. A. No. 20-135, ECF No. 41-1

---

[2] Defendants claim that Plaintiff testified that his placement in the LPHU was not punitive (*Id.* ¶¶ 7-8). His actual testimony, in response to the question whether he was sent there as a punishment or whether it was his "designation," was: "I immediately went to the box, from the street to the box." (Waldron Dep. (ECF No. 30 Ex. C) 17:7-11.)

[3] Bowman, who is represented by the same counsel as Waldron, also commenced an action

at 71:1-3 ("they're saying LPHU is to give more privileges than the RHU status, which there was no difference between the two."); *id.* at 69:13 (stating that he was not allowed out in the yard).

Defendants assert that Plaintiff's placement was in accord with the Administrative Custody Procedures Manual, which states that one of the many reasons an inmate may be assigned to AC status is when "the inmate is being held temporarily for another authority and is not classified for the general population of the holding facility." (DSMF ¶ 11.) The policy that they submitted into evidence states that it applies "when the inmate is being held temporarily for another authority. A Parole Violator (PV) or unclassified temporary transfer from another facility shall be released to general population in accordance with Subsection B.2. below." (ECF No. 30 Ex. F, DC-ADM 802 at § 1(B)(1)(h).)[4] Subsection B.2 provides that:

> Temporary transfers shall not be confined in restricted housing solely on the basis of a temporary transfer status. There must be additional supporting rationale that indicates the inmate is a risk, or at a risk, to release to general population. Facilities shall place all temporary transfers in general population except when exigent circumstances exist (i.e. unsentenced, DC, *out of state PV*, Final Discharge Maximum Expiration [FDME], hold for various authorities). The initial reception committee in conjunction with the PRC, shall review DOC info for any such indicators to base their decision on placing the inmate in restricted housing or releasing to general population when received.

(*Id.* § 802(1)(B)(2)) (emphasis added). These provisions appear to be inconsistent. On one hand, an out-of-state parole (or probation) violator "shall" be released to general population in accordance with Subsection B.2. At the same time, Subsection B.2 provides that temporary transfers shall be placed in the general population *except when exigent circumstances exist.* An out-of-state parole violator is categorized as such an "exigent circumstance" that apparently would require restricted housing.  Subsection B.2 also stated that the initial reception committee

---

raising nearly identical claims about the conditions of confinement for out-of-state probation violators at SCI Mercer. *See Bowman v. Allegheny County*, Civ. A. No. 20-135 (Eddy, M.J.)
[4] Defendants miscite the subsection as § 1(A)(1)(h).

and the Prison Review Committee ("PRC") should review DOC information for "any such indictors" to base their decision on whether to place an inmate in restricted housing or the general population. As explained below, two prison officials testified that they understood this policy to require that out-of-state probation violators could not be placed anywhere but in restrictive custody.

According to Defendants, the DOC did not have information about out-of-state probation violators, which was necessary to ensure that they could be safely housed. (DSMF ¶ 12.) Plaintiff claims that Defendants could easily have obtained this information as demonstrated by the sheer number of prisoners that it does classify. In July 2019, the DOC made a change in its policy to allow the prison to investigate and safely classify inmates who enter facilities as out-of-state parole violators. (PCSMF ¶¶ 3-4.)

The Program Review Committee ("PRC") has general oversight of the LPHU and conducts periodic meetings with inmates to check on their wellbeing. Plaintiff was informed on December 18, 2018 at his initial PRC meeting that he would remain on administrative custody status pending the outcome of Florida authorities. (DCSMF ¶¶ 13-14.) Moreover, in each review by the PRC of Plaintiff's status, the PRC "informed him that he will remain in the RHU on AC status pending the outcome with Florida authorities." (ECF No. 30 Ex. E.)

According to Defendants, Plaintiff did not file any grievances during his incarceration or make any requests of the PRC regarding his housing assignment. Out-of-state probation violators could appeal their placement in the LPHU, first to the PRC, and upon receiving a response from the PRC, to the Superintendent and then to the Central Office. (*Id.* ¶¶ 15-16.) Inmates have the ability to write request slips and, if dissatisfied with the answer, could write to the next person in the chain of command, file a grievance, or speak to a staff member on rounds. Plaintiff did make

other requests at various times, including for a radio, certain commissary items, a television, a newspaper and to make a phone call. (*Id.* ¶¶ 17-20.)

Although Defendants' representations are generally accurate regarding the grievance procedure, Superintendent Adams gave the following testimony about grievances relating to placement in the LPHU:

> Q. Has it ever resulted in the inmate being moved out of the Limited Privileged Housing Unit?
>
> A. It depends on the circumstances.
>
> Q. Okay. But has it—
>
> A. You're talking specific—you're talking about an out-of-state parole violator?
>
> Q. Correct.
>
> …
>
> A. No, they would have stayed there.
>
> Q. Okay. So even if they appealed, there was—the policy was that out-of-state parole violators are in the limited privileged housing unit and they are not—they weren't going anywhere; is that correct?
>
> A. Correct.

(Adams Dep. (ECF No. 30 Ex. B) 8:14-9:3.)[5]

Shane Dady, Deputy Superintendent of Centralized Services at SCI Mercer, also testified that, prior to the policy change in July 2019, the PRC was not permitted to place out-of-state parole violators anywhere except in the RHU or the LPHU. (PCSMF ¶¶ 3-4.)[6] See Dady Dep.

---

[5] In denying Plaintiff's Concise Statement of Material Facts ("DRPCSMF") (ECF No. 37 ¶¶ 3-4) regarding this issue, Defendants cite Superintendent Adams's testimony about the grievance process in general but omit her testimony that out-of-state parole violators "were not going anywhere" other than the LPHU.

[6] According to the Complaint, Plaintiff had already been transported to the Allegheny County Jail by the time this policy went into effect. He remained there until his trial in December 2019,

(ECF No. 34 Ex. 3) at 6:3-9, 17:21-18:2.

B.   <u>Facts Relating to Plaintiff's Transportation</u>

The Allegheny County Sheriff's Department transported Plaintiff on January 4, 2019 and again on February 28, 2019 for purposes of preliminary hearings in Allegheny County.  He was returned to SCI Mercer on January 10, 2019 and March 11, 2019, respectively. He was also picked up by the Sheriff's Department on June 4, 2019 for a pre-trial conference and returned to SCI Mercer on June 18, 2019. (DSMF ¶¶ 23-26.)

In the Complaint, Plaintiff alleges that during his incarceration at SCI Mercer, five preliminary hearings on his pending charge were scheduled and then continued in Allegheny County. On at least three occasions, he asserts, he was transported to the Allegheny County Jail and held there for several days before being transported back the SCI Mercer without explanation. ECF 1 at ¶¶40, 41. SMF at ¶4. While it is undisputed that he did not notify the Allegheny County Court of Common Pleas that he was incarcerated at SCI Mercer, he testified that "I didn't know how I was going to." (DSMF ¶¶ 21-22; Waldron Dep. (ECF No. 30 Ex. C) 29:5.) There is no evidence in the record that Plaintiff's attorneys made efforts to coordinate with the Court of Common Pleas and SCI-Mercer to arrange for Plaintiff's attendance at court hearings or ensure that the Court had the correct address for Plaintiff.

The DOC procedure for releasing an inmate to be transported to a court hearing requires that the records department receive official notification from the court. As long as there is a court notification regarding an inmate lodged in a DOC facility, a transporting authority's request to transport an inmate is not refused. Neither Defendant Adams nor Defendant Wetzel, nor any other DOC staff, monitor the criminal cases of every incarcerated inmate. The DOC does not

---

when he was found not guilty on all counts. (Compl. ¶¶ 44-46.)

release inmates for transport or transport inmates itself to legal appointments absent a notice or order from the court. (*Id.* ¶¶ 27-31.)

## III.    Standard of Review

Pursuant to the Federal Rules of Civil Procedure, summary judgment is appropriate if there are no genuine disputes as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Issues of credibility and weighing of evidence are to be decided by the trier of fact, not the court on a motion for summary judgment. *Id.* at 255.

The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992). In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family*

*YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia, Pa.*, 527 F.3d 299, 310 (3d Cir. 2008).

## IV.    Discussion

Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). *See also Baker*, 443 U.S. at 140; *Graham v. Connor*, 490 U.S. 386, 394 (1989).

Plaintiff's Complaint alleged violations of his Eighth Amendment right to be free from cruel and unusual punishment and his due process rights under the Fourteenth Amendment.[7] The Memorandum Opinion and Order dismissed his Eighth Amendment claim on the ground that the Plaintiff was a pretrial detainee, rather than a convicted prisoner. The Court of Appeals has held that "the Eighth Amendment's Cruel and Unusual Punishments Clause does not apply until 'after sentence and conviction.'" *Hubbard v. Taylor*, 399 F.3d 150, 164 (3d Cir. 2005) ("*Hubbard I*")

---

[7] The Complaint also alleged violations of his rights under the First, Fourth and Fifth Amendments, but these claims were previously dismissed.

(footnote omitted) (quoting *Graham*, 490 U.S. at 392 n.6)). *See also Murray v. Keen*, 763 F. App'x 253, 255 (3d Cir. 2019) ("sentenced prisoners are protected only from punishment that is 'cruel and unusual' while pretrial detainees are protected from any punishment" (citing *Hubbard I,* 399 F.3d at 166-67)).

While they did not seek reconsideration of the Court's ruling on this issue, Defendants suggest in their brief that Plaintiff was not a pretrial detainee because he had been convicted of the charges underlying his probation. (ECF No. 31 at 10 n.5.) However, for purposes of his incarceration at SCI Mercer, Plaintiff was a pretrial detainee until he was tried on his pending DUI charge on December 19, 2019. *See United States v. Dobson*, 585 F.2d 55, 59 (3d Cir. 1978) ("a parole violator is no different than a pretrial detainee who is merely awaiting trial and who, until conviction and sentencing, cannot commence service of a term of imprisonment.") *See also Cupp on behalf of Cupp v. Cty. of Lycoming*, 2021 WL 4478304, at *2 (M.D. Pa. Sept. 30, 2021) ("Cupp was taken into custody and incarcerated at Lycoming County Prison as a pretrial detainee, pending a probation violation hearing."); *Stevenson v. Carroll*, 495 F.3d 62, 67, 69 & n.4 (3d Cir. 2007) (applying Fourteenth Amendment analysis to inmates who had been convicted and sentenced to death but whose sentences had been vacated and were awaiting resentencing).

Therefore, Plaintiff's claims will be analyzed under the Fourteenth Amendment's due process clause.

A. <u>Plaintiff's Due Process Claims</u>

Plaintiff alleges in Count II of the Complaint that Defendants deprived him of his substantive and procedural due process rights under the Fourteenth Amendment. Defendants assert that they are entitled summary judgment with respect to both claims. In turn, Plaintiff seeks judgment in his favor on his procedural due process claim. The parties' contentions are

discussed below.

    1.  Substantive Due Process Claims

        *a.  Indefinite Confinement in the LPHU*

The Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The substantive component of the Due Process Clause limits what government may do regardless of the fairness of the procedures that it employs." *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 399 (3d Cir. 2000). This "guarantee[s] protect[ion] against government power arbitrarily and oppressively exercised." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

In *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979), the Supreme Court established the principle that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." In determining what constitutes "punishment," the Supreme Court found that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." *Id.* at 539.

In making the determination of whether a challenged condition of confinement amounts to a punishment of a pretrial detainee, "'[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'" *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008) ("*Hubbard II*") (quoting *Bell*, 441 U.S. at 538) "[C]onditions that are reasonably related to a penal institution's interest in maintaining jail security typically pass constitutional muster." *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (citing *Bell*, 441 U.S. at 540). In contrast, a "particular measure amounts to punishment when there is a showing of express intent to punish on the part of

detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose." *Id.* (internal quotations and citations omitted); *see also Hubbard II*, 538 F.3d at 232; *Stevenson* 495 F.3d at 68.

In *Stevenson v. Carroll*, three pretrial detainees filed suit when they were placed in a prison's Security Housing Unit (SHU) without explanation or an opportunity to challenge their placement. They asserted that they were not treated the same as other similarly situated inmates because they were not told why they were in the SHU or allowed to challenge this placement. In reversing the dismissal of the case by the district court, the Third Circuit Court of Appeals noted that "[o]ne reasonable inference from the allegations in the complaint of disparate treatment of prisoners is that, at a minimum, the appellants' confinement in the SHU was arbitrary." *Id.* at 68. As the court stated, "as compared to the conditions for the general prison population, housing in the SHU is significantly more restrictive." *Id.* at 68-69. Thus, "a showing by the prison officials that a restrictive housing assignment is predicated on a legitimate managerial concern and is therefore not arbitrary or purposeless, will typically foreclose the substantive due process inquiry." *Id.* at 69.[8] *See Steele v. Cicchi*, 855 F.3d 494, 505-06 (3d Cir. 2017) (pretrial detainee's substantive due process claim dismissed on summary judgment based on evidence that he was transferred to administrative segregation after prison received a credible claim that he was coercing other inmates to use a particular outside bail bond service).

---

[8] The Court of Appeals observed that, although unconstitutional punishment typically involves both objective and subjective components, and the subjective component related to whether the officials acted with a sufficiently culpable state of mind, the Supreme Court in *Bell* allowed for an inference of mens rea where the restriction was arbitrary or purposeless, or where the restriction was excessive, even if it would accomplish a legitimate governmental objective. *Id.* at 68.

Defendants contend that Plaintiff's placement in the LPHU was not sufficiently serious to constitute "punishment." They argue that he did not suffer all the restrictions of inmates placed in the RHU and occasionally had a cellmate. Further, they claim to have had a legitimate reason for placing him in the LPHU because he was an out-of-state probation violator whose history was unknown.

Defendants' arguments are unavailing in the context of a dispositive motion because there are disputed issues of fact regarding whether Plaintiff's conditions of confinement in the LPHU were substantially similar to those of other prisoners incarcerated in the RHU. Defendants contend that the LPHU had fewer restrictions than the RHU, but both Plaintiff and Bowman testified that the differences between the RHU and the LPHU were minimal or non-existent. Further, Plaintiff only had a cellmate on a temporary emergency basis for about ten days.

Moreover, while Defendants assert that it was necessary to house Plaintiff in the LPHU because his background was unknown, they failed to offer any evidence that they attempted to obtain any information about him and were either unable or unsuccessful in doing so. Thus, at least based on the record evidence, Plaintiff was housed in the LPHU for over six months without any effort to seek or obtain the information Defendants claim to be necessary to classify him for possible placement in the general population.

Defendants also contend that confining Plaintiff to the LPHU or RHU for only 185 days was not "atypical" to the ordinary incidents of prison life, citing cases involving longer periods of incarceration. *See Smith v. Messinger*, 293 F.3d 641 (3d Cir. 2002); *Shoats v. Horn*, 213 F.3d 149 (3d Cir. 2000); *Alexander v. Beard*, 2016 WL 6462047, at *5 (W.D. Pa. Nov. 1, 2016). This standard, which was announced in *Sandin v. Conner*, 515 U.S. 472, 484 (1995), does not apply to pretrial detainees, however. *See Stevenson*, 495 F.3d at 69 n.4.

Plaintiff contends that Defendants' alleged penological interest in this practice—that it wasfor the safety both of out-of-state parole/probation violators and other inmates—is purely speculative at this juncture. By contrast, he argues, the harm inflicted by housing inmates in solitary confinement, isolated from all meaningful human contact, is grossly disproportionate to the speculative interest justifying the policy.

The Court of Appeals has recognized the detrimental effects of long-term confinement. *See Williams v. Secretary of the Pa. Dep't of Corrections*, 848 F.3d 549, 566-67 (3d Cir. 2017) (recognizing the growing consensus that long-term solitary confinement "can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity.") As it noted, the Supreme Court found that essentially indefinite solitary confinement with the extreme deprivations imposed gave rise to a protected liberty interest for convicted inmates in avoiding such conditions. *Id.* at 561 (citing *Wilkinson v. Austin*, 545 U.S. 209, 224, (2005)). The Third Circuit observed that:

> This indefiniteness contrasts sharply with other common forms of solitary confinement, such as the punitive segregation that is discussed in *Sandin*. The duration of the deprivations that follow from that seclusion is often predetermined and fixed unless the inmate's behavior is thought to require an additional period of segregation. Here, [the plaintiffs] could have been the most compliant inmates in a given facility, and exhibited no signs they would endanger themselves or others. They would still have been relegated to death row indefinitely even though they had won new sentencing proceedings and were not under active sentences of death. This would follow even if the professionals who are part of the prison PRC reviewed their placements and concluded that that level of confinement was not otherwise warranted. We therefore have no trouble holding that the conditions they had to endure while awaiting resentencing constitute an "atypical ... hardship on the inmate in relation to the ordinary incidents of prison life."

*Id.* at 562 (footnotes omitted). Here, the record similarly supports a conclusion that, regardless of Plaintiff's behavior while in solitary confinement, he would have been kept in the LPHU

indefinitely because of his status as an out-of-state probation violator.

Defendants also contend that Plaintiff has failed to demonstrate that they acted with deliberate indifference. They note that there is no evidence of an express intent to punish Plaintiff or other culpable mindset. Rather, Defendants assert, the evidence of record demonstrates that Plaintiff was placed in the LPHU to protect him and other inmates given the prison's lack of information regarding his past.

The Court of Appeals has "defined deliberate indifference as requiring a "conscious disregard of a substantial risk of serious harm." That is, "deliberate indifference might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known." *L.R. v. School Dist. of Philadelphia*, 836 F.3d 235, 246 (3d Cir. 2016) (footnotes omitted) (as teacher's conduct in releasing a child to a stranger was "so obvious" that it rose to the level of deliberate indifference, this satisfied the objective standard of the Fourteenth Amendment substantive due process clause).

Based on evidence of the conditions at the LPHU and Defendants' failure to take any action to obtain Plaintiff's relevant history, a factfinder could conclude that the application of the DOC's policy either knowingly inflicted pain on him without serving a commensurate governmental objective or that the risk was so obvious that it should have been known. Thus, although Defendants contend that they had no intent to punish Plaintiff, he has raised genuine issues of material fact as to whether the conditions in the LPHU were substantially similar to those in the RHU. Moreover, Defendants' rationale subjects inmates like Plaintiff to be housed in the LPHU indefinitely simply because they lacked easily obtainable information. Such conduct, if believed, could meet the standard of deliberate indifference.

A plaintiff must also plead a defendant's personal involvement in the alleged deprivation

of his constitutional right. *See, e.g., Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id. See also Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). As stated in the text of § 1983 itself, only a person who "subjects, or causes to be subjected" another person to a civil rights violation can be held liable under § 1983. Thus, a defendant can be held liable only for his or her own conduct. *See, e.g., id.; see also Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016); *Barkes v. First Corr. Med.*, 766 F.3d 307, 316 (3d Cir. 2014) (*rev'd sub. nom. on other grounds* 575 U.S. 822 (2015)); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005) ("To impose liability on the individual defendants, Plaintiffs must show that each one individually participated in the alleged constitutional violation or approved of it.") (citing *C.H. v. Oliva*, 226 F.3d 198, 201-02 (3d Cir. 2000) (en banc)).

The Court of Appeals has held that "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Kniepp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996) (citation omitted). Customs are "practices of state officials ... so permanent and well settled as to virtually constitute law." *Id.* (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). In other words, a custom is "an act 'that has not been formally approved by an appropriate decisionmaker' but that is so widespread as to have the force of law." *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (quoting *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997)).

16

In addition, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (citation omitted).

Thus, supervisory officials such as Secretary Wetzel and Superintendent Adams cannot be held liable for every illegal act that takes place in SCI Mercer. Rather, they can be held liable only for their own conduct. *Id.*  Therefore, it is necessary to review the evidence of record regarding the conduct of Secretary Wetzel and that of Superintendent Adams in order to determine if there are issues of material fact that preclude judgment in their favor.

<u>Claim against Secretary Wetzel</u>

Regarding Plaintiff's substantive due process claim against Secretary Wetzel, Plaintiff argues in part that his "placement in solitary confinement was pursuant to official Department of Corrections policy, which is overseen by Defendant Wetzel . . ." (ECF No. 38 at 7.) He contends that the prison had a policy or custom of placing pretrial detainees who are accused of violating out-of-state probation in the LPHU indefinitely due to "exigent circumstances" and that Secretary Wetzel oversaw, was aware of and condoned this custom and policy. This ultimately resulted in Plaintiff's indefinite placement in the LPHU at SCI Mercer in violation of his substantive due process rights.

There is no evidence in the record that Secretary Wetzel had any direct knowledge of Plaintiff's placement in the LPHU or had any role in the decision to place or keep him there. At the same time, however, and regardless of whether Secretary Wetzel was aware of Plaintiff's particular placement, there are material issues of fact regarding whether he is liable as a policymaker for establishing, maintaining and/or condoning a custom or policy that resulted in

Plaintiff's indefinite confinement.[9] As Plaintiff argues, Secretary Wetzel is the signature authority on DOC policies, and as a policy maker, is responsible for statewide establishment and implementation of policies. As such, a fact finder could conclude that he personally endorsed the policy at issue here. Thus, because his personal involvement has not been fully developed, Defendants have not demonstrated that Secretary Wetzel is entitled to judgment as a matter of law regarding this claim.

<u>Claim against Superintendent Adams</u>

Similarly, Defendants have failed to demonstrate that Superintendent Adams is entitled to judgment as a matter of law. The facts of record are not sufficiently developed to draw a any conclusions regarding whether she is potentially liable for conditions of confinement in the LPHU, which are disputed at any rate.  Moreover, there is insufficient evidence about whether she correctly understood and implemented the policy, whether she had any discretion regarding implementation of the policy created by the DOC, whether she was responsible on a supervisory or personal level for the failure to obtain Plaintiff's relevant history or any other aspect of Plaintiff's substantive due process claim. As reviewed above, she may be personally liable if she participated in, directed or had knowledge and acquiesced in a violation of Plaintiff's rights. Thus, there are genuine issues of material fact regarding her policy-making role regarding Plaintiff's confinement in the LPHU and/or potential supervisory liability if she participated in a violation of Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in her subordinates' violations.

---

[9] In the *Love* case, the court noted that Secretary Wetzel could not be held liable for the substantive due process claim because the defendants successfully argued that they were entitled to qualified immunity. That issue was not raised here. 2021 WL 253999, at *10 n.5.

### b. Failure to Transport to Preliminary Hearings

Plaintiff further alleges that Defendants violated his substantive due process rights by failing to transport him to preliminary hearings. The evidence of record supports a finding that any failure to transport Plaintiff was the fault of the transporting third parties as opposed to any deliberate effort to prevent or delay Plaintiff's transport. In fact, Plaintiff was transported from SCI Mercer to the Allegheny County Jail multiple times. At any rate, it is uncontroverted that the responsibility to transport incarcerated parties to court proceedings rests on other law enforcement or court personnel, not on the DOC. In fact, requiring a court order prior to releasing an inmate into the custody of another authority is not arbitrary, purposeless or excessive.

Thus, it is uncontroverted that in this case, transporting Plaintiff to the Allegheny County Jail was the responsibility of the Allegheny County Sheriff's office. There is no evidentiary basis upon which to conclude that either of the defendants here had any  personal involvement or  role in a deliberate effort to prevent or delay Plaintiff's transport and therefore deprive him of a liberty interest.

Therefore, with respect to Plaintiff's substantive due process claims, Defendants' motion for summary judgment will be granted with respect to the denial of transportation claim but otherwise denied.

### 2. Cross-motions Regarding Plaintiff's Procedural Due Process Claim

Both Plaintiff and Defendants seek judgment in their favor regarding Plaintiff's procedural due process claim.

The Supreme Court has held that "[t]he core of due process is the right to notice and a meaningful opportunity to be heard." *LaChance v. Erickson*, 522 U.S. 262, 266 (1998). In

*Stevenson*, the Third Circuit held that "[a]lthough pretrial detainees do not have a liberty interest in being confined in the general prison population, they do have a liberty interest in not being detained indefinitely in the SHU without explanation or review of their confinement." 495 F.3d at 69. The quantity of process required for administrative transfers of pretrial detainees to the RHU need not be extensive. Prison officials must provide "only an explanation of the reason for their transfer as well as an opportunity to respond." *Id.* at 70 (citing *Hewitt v. Helms*, 459 U.S. 460, 474 (1983)). Additional procedures are required when a prisoner is confined in the RHU for disciplinary reasons. *Id.*

According to Defendants, Plaintiff was given a reason for his placement in the LPHU, namely, that "he would remain in RHU on AC status pending outcome of Florida authorities." They also contend that Plaintiff had the opportunity to appeal this decision. However, as outlined above, Superintendent Adams admitted that no grievance or appeal by Plaintiff would have resulted in his release from the RHU or LPHU.

During his deposition, Plaintiff acknowledged that he was probably told as part of the PRC review process that he would "remain on AC status until the Florida matter was resolved." (Waldron Dep. 19:12-13) (ECF No. 30 Ex. C). The following exchange then took place:

Q. Did you ever file an appeal from the PRC's determination of your housing unit?

A. I was never told about any appeal.

Q. Did you ever ask anyone if there was anything you could do challenge the PRC decision?

A. Every day.

Q. And who would you ask?

A. Any lieutenant that would walk by.

Q. What would they tell you?

A. Shut up.

(*Id.* at 19:16-20:1.)

The Court of Appeals has held that "when access to procedure is absolutely blocked or there is evidence that the procedures are a sham, the plaintiff need not pursue them to state a due process claim." *Alvin v. Suzuki*, 227 F.3d 107, 118 (3d Cir. 2000) (citation omitted). Moreover, a plaintiff does not have to take advantage of processes when they "are unavailable or patently inadequate." *Id.* at 116. *See also Sourovelis v. City of Philadelphia*, 320 F.R.D. 12, 22 (E.D. Pa. 2017) (when "a plaintiff is claiming that the available procedures do *not* satisfy due process, the plaintiff need not have fully availed himself of those "patently inadequate" processes in order to have a claim.")

In *Sourbeer v. Robinson*, 791 F.2d 1094, 1102 (3d Cir. 1986), the Third Circuit found that perfunctory reviews of a pretrial detainee's status in administrative custody supported a finding that the inmate was not provided meaningful process under the Due Process Clause. In *Sourbeer*, the plaintiff was convicted of a crime, but not yet sentenced and was confined to SCI-Camp Hill as a pretrial detainee. *Id.* at 1096. Upon his arrival, he was classified as a "Hold for Various Authorities" ("HVA") prisoner because of his status and was placed in the restrictive housing unit in "administrative custody." *Id.* Under prison policies, the plaintiff was to receive periodic review hearings to determine whether he should remain in administrative custody, and he received those reviews in accordance with the policy. *Id.* at 1097-99. Upon review of his administrative custody status, the prison officials noted that he was to remain in administrative custody for various reasons, including because of his HVA/unsentenced status. *Id.* at 1098. While noting that the policy of having periodic reviews of the administrative custody status of unsentenced inmates/detainees facially passed constitutional muster, and that there was was no

evidence that prison officials varied from these policies, the Court of Appeals concluded that there was evidence that Sourbeer's due process rights were nonetheless violated because prison officials applied these reviews in a rote and perfunctory way, denying Sourbeer of a meaningful opportunity to be heard. *Id.* at 1101.

The court found that "[t]o [e]nsure that periodic review does not become simply a sham, the content and substance of that review must be scrutinized under the illumination of the [F]ourteenth [A]mendment." *Id.* (quoting *Mims v. Shapp*, 744 F.2d 946, 954 (3d Cir. 1984)). It concluded that while prison officials included reasons such as a "bad attitude" and his "personality," for keeping Sourbeer in administrative custody, those reasons alone, without evidence of misconduct or psychiatric or psychological evaluations, could not justify his placement in administrative custody. *Id.* at 1101-02. Dismissing those unsupported reasons, the Court of Appeals found that prison officials placed and kept Sourbeer in administrative custody simply because of his status as an unsentenced status. *Id.* at 1102. Therefore, Sourbeer was not afforded meaningful process in violation of the Due Process Clause. *Id. See also Love v. Whitman,* 2021 WL 253999, at *8 (W.D. Pa. Jan. 26, 2021) (following *Sourbeer* and concluding that out-of-state parole violator held in administrative custody at SCI Mercer, who was given periodic reviews but continued to be housed in administrative custody because of his status as an out-of-state parole violator, was not afforded meaningful process).

The facts underlying *Sourbeer* and *Love* are substantially similar to the facts in the instant case. Plaintiff was a pretrial detainee who was being held as an out-of-state probation violator. The applicable prison policy appears to provide that a probation violator would be held in administrative custody but is eligible for release to general population. DC-ADM 802 § 1(B)(1)(h). Plaintiff was provided periodic reviews of his administrative custody status, each

resulting in his continued placement in administrative custody solely because of his status as an out-of-state probation violator. Thus based on the evidence of record, including testimony from SCI-Mercer prison officials, it is reasonable to infer that there were no circumstances under which Plaintiff would have been moved out of administrative custody. He was placed there solely because of his status as an out-of-state probation violator and no investigation was done to ascertain his history or if that placement was appropriate.  Thus, a fact finder could conclude that the reviews of his administrative custody were rote and perfunctory. As such, there is sufficient evidence to support a finding that Plaintiff was not afforded meaningful process.

Defendants cite *Bracey v. Secretary, Pennsylvania Department of Corrections*, 686 F. App'x 130 (3d Cir. 2017) in which the court stated that, with respect to a convicted inmate, "the periodic review offered to Pennsylvania inmates who are indefinitely confined in administrative confinement comports with procedural due process, *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000)." *Id.* at 135-36. Similarly, in *Shoats*, the court found that while a convicted inmate stated a liberty interest in not being held in administrative custody for eight years, his continued administrative custody status did not violate his procedural due process rights. This finding was based on the fact that the inmate received periodic reviews in accordance with DOC policy and prison officials justified his continued administrative custody because they considered him a current threat to the security of the institution and the safety of others. 213 F.3d at 146. The court also noted that the plaintiff was not challenging whether his process was meaningful or that he was denied an opportunity to be heard. *Id.* (citing *Sourbeer*, 791 F.2d at 1101). *See also Huertas v. Secretary, Pennsylvania Department of Corrections*, 533 F. App'x 64, 65-68 (3d Cir. 2013) (prison officials justified inmate's continued administrative custody because of continuing security concerns); *Washington-El v. Beard*, 562 F. App'x 61, 63 (3d Cir. 2014) (inmate placed

in administrative custody because he was classified as an escape risk).

Plaintiff was a pretrial detainee, not a convicted inmate. He was not found to pose a security threat to the institution and the safety of others or an escape risk. Rather, he was housed in restricted status solely because of his out-of-state probation violator status. He has challenged the review process of his status as not meaningful. Thus, *Sourbeer*, rather than *Bracey, Shoats, Huertas* and *Washington-El*, is the precedent on point.

Defendants argue that because Plaintiff did not avail himself of any appeals, he cannot speculate as to what the outcome of any such appeal would have been. However, both Superintendent Adams and Deputy Superintendent Dady confirmed that that before the change in DOC policy in July 2019, the PRC was not permitted to place out-of-state probation violators anywhere except in the RHU or the LPHU. Thus, based on the record, an appeal by Plaintiff would have made no difference in his placement.

### a. *Defendant's motion as to Secretary Wetzel*

Plaintiff does not contend that Secretary Wetzel had any personal involvement in impeding or preventing Plaintiff's exercise of his procedural due process rights. Further, there is no evidence in the record that Secretary Wetzel directed SCI Mercer to indefinitely confine Plaintiff to the LPHU without providing him with a meaningful review or an opportunity to appeal, or even that Secretary Wetzel had any knowledge of what occurred. *See Love*, 2021 WL 253999, at *10 ("Plaintiff has offered no evidence that Wetzel knew that Plaintiff as an out-of-state parole violator was being kept in administrative custody and would never be released to general population, contrary to prison policy which outlined that parole violators were eligible for release to general population.")

Therefore, with respect to Secretary Wetzel, Defendants' motion for summary judgment

will be granted with respect to Plaintiff's procedural due process claim. As discussed below, however, because there are genuine issues of material fact regarding the liability of Superintendent Adams, Defendants' motion regarding Superintendent Adams will be denied.

      *b. Plaintiff's partial motion for summary judgment as to Superintendent Adams*

   Plaintiff has moved for partial summary judgment with respect to his procedural due process claim. He contends that the undisputed evidence demonstrates that he was subjected to a policy that placed him in the RHU or LPHU simply because he was an out-of-state probation violator and that there was no process that would have allowed him to be released from that confinement. The Court agrees that it is uncontroverted that he was placed in the LPHU because he was an out-of-state probation violator and there is record evidence that no grievance or appeal by Plaintiff, even if it was made available, would have resulted in his release from the LPHU.

   Nevertheless, Plaintiff has not established all of the elements of his claim as it relates to the personal involvement or potential liability of Superintendent Adams. Simply put, the record is not fully developed regarding her actions. Although she testified that no grievance or appeal by Plaintiff would have resulted in his release from the LPHU, she may or may not have been following a DOC policy. She may not have fully understood or reconciled the potentially conflicting portions of the DOC policy or had the authority to exercise discretion regarding its implementation and operation. There is also insufficient evidence of record regarding the nature and extent, if any, of her direction, knowledge or acquiescence in what Plaintiff claims to have been told regarding the appeal process. Further, as it relates to Plaintiff, there is insufficient evidence regarding her supervisory role or personal involvement in the process outlined in the DOC policy at issue, i.e., that "the initial reception committee in conjunction with the PRC, shall review DOC info for any such indicators to base their decision on placing the inmate in restricted

housing or releasing to general population when received." In short, relevant facts and issues relevant to the potential liability of Superintendent Adams for a procedural due process violation have not been sufficiently raised and briefed by the parties to permit any conclusive determination at the summary judgment stage.

Therefore, Plaintiff's motion for partial summary judgment with respect to his procedural due process claim will be denied.

## V.   Conclusion

For these reasons, Plaintiff's motion for partial summary judgment regarding the procedural due process claim will be denied. Defendants' motion for summary judgment will be granted in part and denied in part. Their motion will be granted with respect to Plaintiff's claims relating to his transportation to the Allegheny County Jail and the procedural due process claim against Secretary Wetzel, but otherwise denied.

Appropriate orders will be entered.


Dated: December 6, 2021                    BY THE COURT:


                                           s/ Patricia L Dodge
                                           PATRICIA L. DODGE
                                           United States Magistrate Judge